UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RODERICK DUANE LEWIS,

        Petitioner,

                                    CASE NO. 05-CV-74202-DT

   v.                         JUDGE ARTHUR J. TARNOW

                                    MAGISTRATE JUDGE PAUL J. KOMIVES

THOMAS K. BELL[1],

        Respondent.
_____/

**REPORT AND RECOMMENDATION**

*Table of Contents*

I.     RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
II.    REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     A.    *Procedural History* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     B.    *Factual Background Underlying Petitioner's Conviction* . . . . . . . . . . . . . . . . 7
     C.    *Timeliness of Petitioner's Habeas Application* . . . . . . . . . . . . . . . . . . . . . . . . 13
     D.    *Exhaustion* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
     E.    *Procedural Default* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
     F.    *Standard of Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
     G.    *Claim I: McKay's Identifications of Petitioner* . . . . . . . . . . . . . . . . . . . . . . . 24
          1.    *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
          2.    *Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
          3.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
     H.    *Claim 11: Loss of Surveillance Video* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
          1.    *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
          2.    *Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
          3.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
     I.    *Claim III: The Judge's Comments to the Deadlocked Jury* . . . . . . . . . . . . . . 34
          1.    *Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34
          2.    *Applicable Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
          3.    *Analysis* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
     J.    *Claim IV: Failure to Correct Perjured Testimony* . . . . . . . . . . . . . . . . . . . . . . 40

_____

      [1] By order entered this day, Thomas K. Bell has been substituted for Kurt Jones as the proper Respondent.

|   |   | 1. | *Background* ............................................... 40 |
|   |   | 2. | *Applicable Law* ........................................... 40 |
|   |   | 3. | *Analysis* ................................................. 41 |
|   | K. | *Claim V: Ineffective Assistance of Trial Counsel* ....................... 42 |
|   |   | 1. | *Background* ............................................... 42 |
|   |   | 2. | *Applicable Law* ........................................... 42 |
|   |   | 3. | *Analysis* ................................................. 43 |
|   | L. | *Claim VI: Ineffective Assistance of Appellate Counsel* ................... 44 |
|   |   | 1. | *Background* ............................................... 44 |
|   |   | 2. | *Applicable Law* ........................................... 44 |
|   |   | 3. | *Analysis* ................................................. 45 |
|   | M. | *Claim VII: Trial Court's Refusal to Exclude McKay's Testimony* ........... 46 |
|   |   | 1. | *Background* ............................................... 46 |
|   |   | 2. | *Applicable Law* ........................................... 46 |
|   |   | 3. | *Analysis* ................................................. 47 |
|   | N. | *Conclusion* ................................................. 47 |
| III. | | | NOTICE TO PARTIES REGARDING OBJECTIONS ........................ 48 |

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus.

II.     REPORT:

A.      *Procedural History*

1.      Petitioner Roderick Duane Lewis is a state prisoner currently confined at the Carson City Correctional Facility in Carson City, Michigan.

2.      On December 12, 1997 petitioner was convicted of felony murder[2], MICH. COMP. LAWS § 750.316, assault with intent to commit murder, MICH. COMP. LAWS § 750.83, and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in Detroit Recorder's Court (now Wayne County Circuit Court).  On January 6, 1998, he was sentenced to concurrent prison terms of mandatory life without parole and 30 to 60 years, consecutive to 2 years for the felony firearm.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claims:

I.      THE COURT BELOW ERRED BY REFUSING TO SUPPRESS THE IDENTIFICATION TESTIMONY OF WITNESS MICAH MCKAY, WHERE IN THE LINEUP CONDUCTED JUST DAYS BEFORE THE TRIAL THE POLICE ASKED MCKAY TO IDENTIFY DEFENDANT RODERICK LEWIS, WHERE MCKAY HAD SEEN MR. LEWIS BEFORE IN COURT, AND WHERE MR. LEWIS WAS NOT JUST THE ONLY PARTICIPANT WHO MATCHED THE SIZE AND COMPLEXION OF THE SHOOTER, BUT WAS ALSO THE ONLY PARTICIPANT WITH THE SHAVED HEAD MCKAY KNEW THE DEFENDANT TO HAVE.

II.     BECAUSE THE ONLY ISSUE AT TRIAL WAS IDENTIFICATION, MR.

_____

[2] On this count,  the jurors were instructed on both felony murder and premeditated murder. The jurors acquitted petitioner of premeditated murder  but found him guilty of both second degree and felony murder.  The trial court subsequently vacated the second degree murder conviction.

3

LEWIS WAS DEPRIVED OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY THE PROSECUTION'S UNEXPLAINED LOSS OF A STORE VIDEOTAPE THAT MR. LEWIS REQUESTED AND THAT APPARENTLY SHOWED THE ACTUAL PERPETRATOR; AT THE LEAST AN ADVERSE-INFERENCE INSTRUCTION SHOULD HAVE BEEN GIVEN, AND EITHER THE COURT ERRED BY NOT DOING SO SUA SPONTE OR COUNSEL WAS INEFFECTIVE FOR NOT MAKING THE REQUEST.

III.   WHERE THE POLICE WITNESS DESCRIBED ONLY PERFUNCTORY STEPS TAKEN TO LOCATE THE MISSING VIDEOTAPE, THE TRIAL COURT ERRED BY ALLOWING THE WITNESS TO TESTIFY, OVER A BEST-EVIDENCE OBJECTION, ABOUT WHAT SHE HAD SEEN ON THE TAPE.

IV.   THE TRIAL COURT ERRED BY REFUSING TO EXCLUDE THE TESTIMONY OF A WITNESS WHO VIOLATED THE PRELIMINARY EXAMINATION JUDGE'S SEQUESTRATION ORDER--AN ORDER WHICH EXPLICITLY WARNED THAT VIOLATORS WOULD FORFEIT THE OPPORTUNITY TO TESTIFY AT TRIAL--AND THUS WHO OVERHEARD THE TESTIMONY OF THE VERY WITNESS WHOSE TESTIMONY HE WAS LATER CALLED TO CORROBORATE AT TRIAL.

The court of appeals found no merit to petitioner's claims and affirmed his convictions and sentences. *See People v. Lewis*, No. 210026, 2000 WL 33529630 (Mich. Ct. App. March 3, 2000) (per curiam) ("State Appeal").

4.   Petitioner, through counsel, sought leave to appeal these same four issues to the Michigan Supreme Court.   On September 26, 2000 the Supreme Court denied petitioner's application for leave to appeal in a standard order. *See People v. Lewis,* 463 Mich. 879, 617 N.W.2d 695 (2000).

5.   Petitioner subsequently[3] filed a *pro se* motion for relief from judgment in the trial

---

[3]  There is a conflict concerning the specific date, as will be discussed.

4

court pursuant to MICH. CT. R. 6.500-.508, raising the following claims:

> I.    MR. LEWIS WAS DENIED HIS CONSTITUTIONAL RIGHTS TO A FAIR TRIAL AND DUE PROCESS AS A RESULT OF THE TRIAL COURT'S COMMENTS TO HIS DEAD-LOCKED JURY.
>
> II.   DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND A FAIR TRIAL DUE TO THE PROSECUTOR'S FAILURE TO CORRECT PERJURED TESTIMONY.
>
> III.  DEFENDANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO OBJECT TO THE TRIAL COURT'S COERCIVE COMMENTS TO THE DEFENDANT'S DEADLOCKED JURY AND FAILED TO IMPEACH A KEY WITNESS WITH PERJURED TESTIMONY.
>
> IV.   DEFENDANT WAS DEPRIVED OF THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WHERE COUNSEL FAILED TO RAISE MERITORIOUS CONSTITUTIONAL CLAIMS.

On March 26, 2003, the trial court denied petitioner's motion for relief from judgment. *People v. Lewis,* No. 97-3617 (Wayne County Cir. Ct. March 26, 2003).   The Michigan Court of Appeals denied petitioner's application for leave to appeal in a standard order based on petitioner's "failure to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Lewis,*  No. 254606 (Mich. Ct. App. December 16, 2004). On May 31, 2005, the Michigan Supreme Court denied leave to appeal in a similarly worded  form order.  *People v. Lewis*, 472 Mich. 921, 696 N.W.2d 717 (2005).

6.    Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on November 2, 2005.  The district court granted his motion to amend and an amended petition was filed on April 4, 2006.   A second uncontested motion to amend was filed on June 8, 2006 and is granted by  order entered this day.  As grounds for the writ of habeas corpus, he raises  seven of the issues raised below, now stated as follows.

I.      THE TRIAL COURT VIOLATED PETITIONER'S DUE PROCESS RIGHTS TO A FAIR TRIAL BY REFUSING TO SUPPRESS THE IDENTIFICATION TESTIMONY OF WITNESS MICAH MCKAY.

II.     PETITIONER WAS DEPRIVED OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL BY THE PROSECUTION'S UNEXPLAINED LOSS OF A STORE VIDEOTAPE THAT PETITIONER REQUESTED AND THAT APPARENTLY SHOWED THE ACTUAL PERPETRATOR.

III.    PETITIONER WAS DEPRIVED OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN THE TRIAL COURT MADE COERCIVE COMMENTS TO HIS DEAD-LOCKED JURY.

IV.     PETITIONER  WAS DEPRIVED OF HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL DUE TO THE PROSECUTOR'S FAILURE TO CORRECT PERJURED TESTIMONY.

V.      PETITIONER WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN COUNSEL FAILED TO OBJECT TO THE TRIAL COURT'S COERCIVE COMMENTS TO HIS DEADLOCKED JURY, AND WHEN HE FAILED TO IMPEACH A KEY WITNESS WITH PERJURED TESTIMONY.

VI.     PETITIONER WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WHERE COUNSEL FAILED TO RAISE MERITORIOUS CONSTITUTIONAL CLAIMS.

VII.    PETITIONER'S TRIAL WAS RENDERED FUNDAMENTALLY UNFAIR WHEN THE TRIAL COURT REFUSED TO EXCLUDE THE TRIAL TESTIMONY OF A WITNESS WHO VIOLATED THE PRELIMINARY EXAMINATION JUDGE'S SEQUESTRATION ORDER.

7.      Respondent filed his answer on April 25, 2006.  He contends that petitioner's habeas petition is  time-barred, that claim VII contains an unexhausted claim subjecting the entire petition to dismissal, that claims III, IV and V  are procedurally defaulted,  and that all of the claims lack merit.

8.      Petitioner filed a reply to respondent's answer on May 30, 2006.  He contends that

respondent's statute of limitations argument is based on inaccurate information; that claim VII alleges a denial of fundamental fairness or alternatively that the other exhausted claims should nonetheless be reviewed; and that claims claims III, IV, and V are not procedurally barred.

B.    *Factual Background Underlying Petitioner's Conviction*

The prosecution's theory at trial was that petitioner and a second unidentified perpetrator, under the guise of a drug sale, shot the two would-be buyers and took their money. Ronald Holder survived even though he was shot nine times. Clarence Greer did not. Two witnesses identified petitioner as one of the shooters, Holder and Micah McKay. It was the defense theory that Holder and McKay were not credible witnesses, that the police work was shoddy and the identification procedures suggestive, and that therefore the prosecution failed to prove beyond a reasonable doubt that petitioner was one of the shooters. The defense also argued that there was a reasonable doubt as to how the shootings actually occurred.

Holder testified at trial as follows: On the morning of April 8, 1997, he and Greer went to the Brewster Projects in Holder's van. Greer intended to meet with "Du-Rod" to arrange a drug deal. Du-Rod was not there so they drove downtown to Nicky's restaurant. Holder called Micah McKay and McKay and Paul Bridges met him and Greer outside the restaurant (Holder denied that Shawn Hall was also there). Holder and Greer then drove back to the Brewster Projects and the other two men followed in McKay's car. It was about 2:00 or 2:30 in the afternoon. Greer went to an apartment and returned with Du-Rod, whom Holder identified in court as petitioner. Holder had never seen him before. Greer and petitioner and McKay entered Holder's van but then petitioner and McKay exited and went into McKay's car for five or ten minutes. Petitioner exited McKay's vehicle and McKay and Bridges drove away, stopping at Holder's van for McKay to tell Holder

that he did not think petitioner was "legitimate." (12/9/97 Trial Transcript, p. 143).

Petitioner reentered Holder's van and directed Holder to drive to the Belmont Shopping Center at Eight Mile and Dequindre to get the drugs. There petitioner said he was going into the Perry's or the Rite Aid and Holder watched him walk in that direction. Meanwhile, Holder had called his friend Shawn Hall and asked him to meet him at the shopping center; Holder wanted Hall there for protection. Holder went and sat in Hall's car. Petitioner returned to the van with a second unknown man. They motioned to Holder and Hall to follow the van, which Greer was now driving. They drove down Eight Mile and then a block or so down a side street (other witnesses established this was Fleming Street). Holder got back into the van while Hall waited in his car. Holder was in the back seat with the unknown man and petitioner was in the front seat next to Greer. Holder gave Greer two thousand dollars to buy two ounces of cocaine and Greer handed the money to petitioner. Holder asked petitioner to see the drugs. Petitioner nodded to his companion in the back seat. This man opened the sliding door, exited the van and began shooting. His gun looked like a nine millimeter. Petitioner began shooting as well. Holder was hit several times. Petitioner exited the van and he and the second man began shooting at Hall. The second man returned to the van and shot Holder three more times, in the chest.

Holder was still conscious when the police arrived. He told them that he and Greer were shot during a robbery. He did not tell them that the shootings were drug related because he had a pending drug charge. He arrived at the hospital at around 4:00 p.m..

Two days later, on April 10, 1997, Officer Quick interviewed him at the hospital. Holder told Quick that "Du-Rod" was one of the shooters and described him as a dark complected black male in his mid-twenties wearing blue jeans, a black leather jacket with gold studs, and a baseball

cap.   He again said nothing about the drug deal nor did he mention McKay.   He also said that Du-Rod had gone *into* the drug store at the shopping center.   McKay visited Holder in the hospital and they discussed what they would tell the police, including not mentioning a drug deal.   On April 11, 1997, Officer Quick returned to the hospital and showed Holder seven photographs.   Holder identified  that of petitioner as Du-Rod.   That photograph was darker than the others but Holder denied that this influenced him.   He explained that he was with petitioner for an hour or an hour and a half, that he clearly remembered petitioner's face, and that he was positive about his identification.   He was also shown a second group of photographs but made no further identifications.   By the time of trial, Holder was serving a 16 year federal sentence on a drug conspiracy charge.

Micah McKay testified to the following: When he and Bridges went to Nicky's restaurant, Shawn [Hall] was there with Greer and Holder.   Hall remained at Nicky's because "he smelled the rat"[4] while the rest went to the Brewster Projects to buy drugs.   There they met Du-Rod whom McKay identified in court as petitioner.   McKay had not met Du-Rod  before that day but he was in the backseat of McKay's car  for about five or six minutes and  McKay was looking back and forth at him the entire time.   They discussed the terms of a drug deal and Du-Rod wrote down his beeper number with the word "Du." Ultimately McKay concluded that he was wasting his time and he and Bridges left, stopping long enough to tell Holder that Du-Rod had nothing.

McKay learned of the shootings later that day and went to see Holder in the hospital. Initially in his testimony McKay denied that he had been able  to speak to Holder that night but when confronted on cross-examination with his statement to the police he admitted that they had spoken and that they had agreed not to mention the drug angle.   Holder told McKay what had

---

[4]  12/9/97 Trial Transcript, p. 97.

transpired; this included an assertion that petitioner had been in the *back* seat with him.

McKay spoke to the police on April 9, 1997. He told them that "Du" was one of the shooters and he gave a description of a very dark-complected black male, 19 to 23 years old, 160 to 170 pounds, 5'11" tall, wearing a skull cap and black leather jacket with gold studs. He could not tell if "Du" had hair or was clean shaven. He did not tell the police that they were at the projects to buy drugs or that Bridges was with him. Instead he lied and told them that Greer and Du were involved in the music production business and were meeting about that. He also told the police several other lies, including that he had been with Du for twenty minutes, that he had ridden in Holder's van to the projects and that he and the others had gone with petitioner from the projects back to Nicky's restaurant.

McKay attended the preliminary examination on May 8, 1997 and he was in the courtroom for part of Holder's testimony. He denied that he was aware that he was not supposed to be in the courtroom and denied that this influenced his trial testimony. He was sitting behind petitioner and could only see the back of his head.

McKay attended a lineup on December 5, 1997, a few days before trial began. He was asked to identify Du and he selected petitioner. Only one other participant was as dark complected as petitioner and he was significantly heavier. Petitioner was also the only participant with a clean shaven head. However McKay denied that he relied on petitioner's complexion, weight, or shaved head in making the identification. He identified petitioner from his face, which he remembered because of the resemblance to a friend of his.

Two witnesses who lived on Fleming Street testified that on April 8, 1997 at about 4:00 p.m. they heard gunshots and then saw two black males in black or black and white jackets running

from the area.

Officer Stefani testified that he received the radio report of gunfire on Fleming at around 4:30 p.m. and responded to the scene. In the van, he found Greer, who appeared to be dead, and Holder, who also had several gunshot wounds. Holder told him that two men had walked up to the van from the passenger side and fired several rounds, hitting both Greer and Holder, and then had leaned inside the van and pumped several more rounds into Holder. Stefani thought the story inconsistent with the fact that the windows were still intact and suspected that an empty plastic bag in the van was a cocaine container. Holder also said that he did not know the shooters but that Greer had.

Officer Rodriguez, another responding officer, testified that he questioned Holder before Stefani. Holder first said that the perpetrators, two black males, were sitting in the van when the shooting took place. Holder then changed this and said that the perpetrators were shooting from outside the van. He said could not recall anything else and did not provide any names.

Other police testimony established that three spent nine-millimeter casings were found, one outside the driver's door, one outside the front passenger door and one on the rear seat. Four spent bullets of an undetermined caliber were also found, two on the rear floorboard, one on the front passenger floorboard, and one on the rear seat. A pager and a wallet were also found in the van; the wallet did not contain money or identification. The police dusted a coffee mug inside the van for prints but they did not check any other objects or any part of the van for prints. The property taken from Holder at the hospital included $209.

The forensic pathologist testified that Greer was shot six times, including a close range shot to the head. Blood tests showed the presence of cocaine metabolites, indicating use within two

11

hours of death.

Officer Quick testified that when Holder told him that Du-Rod was one of the shooters, he recognized the name from a previous contact as petitioner's nickname.  He located a photograph of petitioner and selected six additional  photos of dark complected males in the same age group to show Holder.   Holder immediately selected petitioner's photo.   Quick acknowledged that petitioner's photo was darker overall than the others.  Quick  showed Holder the second set of photographs, which did not include petitioner, in the hopes of identifying the second shooter; Holder did not identify anyone from this group.

The parties stipulated that the attorney present at the McKay lineup had objected to its makeup on the basis of  petitioner's size and baldness.

Investigator Newson, the current officer in charge,  testified that he  arranged the lineup for McKay.  He tried to accommodate the lineup attorney's objections, which were based on size, clothing and hair, but he could find no satisfactory substitutes among the limited number of inmates in the detention section of police headquarters; timing constraints prevented him from conducting the lineup at the jail.   He confirmed that only petitioner and one other participant were very dark and that the other one outweighed petitioner by 71 pounds.  He also confirmed that petitioner was the only one with a clean shaven head.  It only took McKay a minute to select him.

Newson also testified that he had tried unsuccessfully to locate Paul Bridges, who was on fugitive status.  When asked if he tried to locate Shawn Hall, he responded that he did not know who that was.

Homicide Investigator Shari Oliver testified that she had been one of the previous officers in charge.  In her attempts to identify the second shooter, she obtained and viewed the surveillance

videotape for April 8, 1997 from the Rite-Aid Pharmacy in the Belmont Shopping Center. The tape was black and white and of a poor quality: "You could see eyes, nose, and mouth, but you couldn't look at it and identify a person." (12/10/97 Trial Transcript, p 11).  A witness had described one of the suspects as wearing a black and white leather jacket with studs and the tape did show someone wearing a jacket like that entering the store, but there was no clear shot of his face.  A copy of the tape was made but neither the original nor the copy were any longer in the possession of the Detroit Police Department.  She did not know what happened to them.

C.     *Timeliness of Petitioner's Habeas Application*

Respondent argues in his Answer in Opposition to Petition for Writ of Habeas Corpus that petitioner's claims are barred by the statute of limitations.  The argument is based on the assumption that petitioner's motion for relief from judgment was filed on November 2, 2002, which respondent incorrectly states is the date indicated in the circuit court docket entries.  The date of filing in the original docket entries is in fact November 7, 2002.  In his reply brief petitioner contends that he filed the motion on July 18, 2001.  He has attached a letter from Jerome Fekin, the director of the case processing department of Wayne County Circuit Court, stating that petitioner's original motion for relief from judgment was lost and never forwarded to the trial judge for decision and that a copy of the motion was refiled on November 7, 2002.  Mr. Fekin also states that based on the postal receipts petitioner provided he  amended the docket entries to reflect that the motion was filed on July 18, 2001.  Petitioner has also attached a copy of the amended page of the docket entries and of his mail receipt showing that the motion was delivered to the circuit court on July 18, 2001.  Respondent has not filed an answer to petitioner's reply challenging the accuracy of the amended docket entries.  Because the AEDPA's one-year statute of limitations is not jurisdictional and a

13

failure to comply is an affirmative defense, *see Day v. McDonough*, 126 S.Ct. 1675 (2006), it will be assumed that the amended docket entries are accurate and that the motion for relief from judgment was filed on July 18, 2001.

Petitioner in his reply has also attached the Department of Corrections form showing that he submitted his petition for writ of habeas corpus for mailing on October 27, 2005.  Pursuant to the "prison mail box rule" of *Houston v. Lack*, 487 U.S. 266 (1988), a pleading is "filed" by a pro se prisoner when it is given to a prison official for mailing.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) established a one-year period of limitations for habeas petitions filed by state prisoners. See 28 U.S.C. § 2244(d)(1).  In this case the limitations period runs from "the date on which the judgment became final by the conclusion of direct review..." 28 U.S.C. § 2244(d)(1)(A).  A conviction becomes final under § 2244(d)(1)(A)  when "the time for filing a petition for a writ of certiorari for direct review in the United States Supreme Court has expired." *Bronaugh v. Ohio*, 235 F.3d 280, 283 (6th Cir.2000) (citing *Isham v. Randle*, 226 F.3d 691, 694-95 (6th Cir.2000)). Under Supreme Court Rule 13, this is 90 days after the entry of judgment.

The statute further provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection." 28 U.S.C. § 2244(d)(2).  While this tolling provision stops the limitations period from running while a petitioner seeks collateral or post-conviction review in the state court, it does not reset the limitations clock. *See McMurray v. Scutt*, 136 Fed. Appx. 815, 817 (6th Cir. 2005); *Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003).  The statute of limitations is tolled from the date of the filing of an application

14

for state post-conviction or other collateral relief until the conclusion of the time for seeking Supreme Court review of the state's final judgment on that application, independent of whether Supreme Court review is actually sought. *Abela v. Martin*, 348 F.3d 164, 172-73 (6th Cir. 2003).

Adding ninety days to the date leave was denied on direct appeal (September 26, 2000), petitioner's conviction was final on December 25, 2000.   Assuming that petitioner filed his motion for relief from judgment on July 18, 2001, 204 days of the one year limitations period had elapsed. The clock would have began to run again ninety days after the date the Supreme Court denied leave to appeal the denial of the motion (May 31, 2005), on August 29, 2005.   The petition for writ of habeas corpus was filed under the mail box rule on October 27, 2005, 59 days later.   The petition was thus filed well within the statutory period.

D.     *Exhaustion*

In Claim VII petitioner argues that his federal constitutional rights were violated when the trial court allowed a witness to testify after having violated a sequestration order.   This issue was raised in the state courts as a violation of state law only.   Respondent correctly argues that the constitutional claim is not exhausted and that the entire petition is therefore subject to dismissal.

The federal habeas statute provides in relevant part that "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that ... the applicant has exhausted the remedies available in the courts of the State [.]" 28 U.S.C. § 2254(b)(1)(A).   The exhaustion requirement serves the interests of comity and federalism and  requires that the state court have the first opportunity to correct a constitutional violation.   *Rhines v. Weber*, 544 U.S. 269, 273-274 (2005); *Turner v. Bagley*, 401 F.3d 718, 724

15

(6th Cir. 2005).   To satisfy the exhaustion requirement a petitioner must  "fairly present" the substance of  his federal constitutional claim to the state courts.  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Clinkscale v. Carter*, 375 F.3d 430, 437 (6th Cir.2004).   A petitioner "fairly presents" his claim to the state courts by either (1) relying upon federal cases employing federal constitutional analysis; (2) relying upon state cases employing such an analysis; (3) phrasing the claim in terms of federal constitutional law; or (4) alleging facts within the mainstream of federal constitutional law. See *Clinkscale*, 375 F.3d at 437 (quoting *Newton v. Million*, 349 F.3d 873, 878 (6th Cir.2003)). Petitioner did none of the above.

Petitioner did exhaust his remaining claims.   A "mixed petition," that is a petition which contains both exhausted and unexhausted claims, must be treated as unexhausted in its entirety. *See Rose v. Lundy*, 455 U.S. 509, 522 (1982). A federal habeas court has no authority to grant relief on even an exhausted claim where the petition also contains unexhausted claims. See *Rockwell v. Yukins*, 217 F.3d 421, 424 (6th Cir.2000).  However a habeas petition "may be *denied* on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(2) (emphasis added). Thus a federal court may decide a habeas petition on the merits when the grounds for relief are without merit or are not cognizable on habeas review. *See Cain v. Redman*, 947 F.2d 817, 820 (6th Cir.1991); *Prather v. Rees*, 822 F.2d 1418, 1421-1422 (6th Cir.1987).

While a district court has discretion in limited circumstances under the AEDPA to hold mixed petitions in abeyance to allow the petitioner to return to state court to exhaust all of his claims, "the district court would abuse its discretion if it were to grant him a stay when his unexhausted claims are plainly meritless."   *Rhines v. Weber*, 544 U.S. at 277.   In these

circumstances the court should deny the unexhausted claims on the merits to save the state courts the useless review of meritless constitutional claims. See *Cain*, 947 F.2d at 820.

Because as discussed below petitioner is not entitled to habeas relief on any of his claims, the Court should deny the unexhausted claim on the merits rather than dismiss the entire petition or hold it in abeyance.

E.    *Procedural Default*

Respondent contends that petitioner's third, fourth, and fifth claims, which were not raised on direct appeal, are barred by petitioner's procedural default in the state courts. The court should disagree.

Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris v. Reed*, 489 U.S. 255, 263 (1989). Federal courts on habeas corpus review presume that there is no independent and adequate state ground for a state court decision when the decision "fairly appears to rest primarily on federal law, or to be interwoven with the federal law, and when the adequacy and independence of any possible state law ground is not clear from the face of the opinion." *Coleman* at 734. Further "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)).

17

For purposes of procedural default, the state ruling with which the federal court is concerned is the "last explained state court judgment ." *Munson v. Kapture*, 384 F.3d 310, 314 (6th Cir. 2004).

Here, petitioner first presented his purportedly defaulted habeas claims in his motion for relief from judgment. Michigan Court Rule 6.508, governing motions for relief from judgment, provides that the movant "bears the burden of establishing entitlement to relief." MICH. CT. R. 6.508(D). The rule goes on to provide, in three separately numbered paragraphs, procedural situations in which relief will not be granted: (1) where an appeal relating to the conviction is pending; (2) where the claim has already been ruled upon in a prior appeal or postconviction motion; and (3) where the claim could have been raised in a prior appeal or postconviction motion but was not. *See* MICH. CT. R. 6.508(D)(1)-(3).

As indicated above, the Michigan Court of Appeals and the Michigan Supreme Court both rejected petitioner's appeal based on his failure to meet the burden of establishing entitlement to relief under MCR 6.508(D). Respondent argues that the appeal was thus decided on state procedural grounds, relying on the Sixth Circuit's decision in *Simpson v. Jones*, 238 F.3d 399 (6th Cir. 2000), in which the court held that identical language constitutes an invocation of the procedural aspects of Rule 6.508(D) and thus bars federal habeas review. *See also, Luberda v. Trippett,* 211 F.3d 1004, 408 (6th Cir. 2000).

However, a more recent decision by the Sixth Circuit has limited the breadth of the *Simpson* rule. In *Abela v. Martin*, 380 F.3d 915 (6th Cir. 2004), the Court explained that its previous decisions in *Simpson* and *Burroughs v. Makowski*, 282 F.3d 410 (6th Cir. 2003) were based on the fact that the lower state courts in those cases had expressly invoked the procedural aspect of Rule 6.508(D)(3), and therefore the court could be fairly certain that the Michigan Supreme Court's

18

citation to "MCR 6.508(D)" was intended as an invocation of the procedural aspect of that rule.  In

*Abela*, however, the lower courts had addressed the petitioner's claims on the merits, and this was

enough to distinguish *Simpson* and *Burroughs*:

> The facts in Simpson and Burroughs inspired greater certainty that the Michigan Supreme Court actually relied on a procedural bar in rendering its judgment. No such clarifying indicators are present here. Moreover, Simpson and Burroughs do not purport to eviscerate our Circuit's rule that a state procedural rule is an "independent and adequate" state ground only if the state court rendering judgment in the case "clearly and expressly stated that its judgment rested on a procedural bar." [Simpson v.] Sparkman, 94 F.3d [199]at 202 [(6th Cir. 1996)]. Simpson and Burroughs did not hold that we should divine procedural default from any and all references to M.C.R. 6.508(D) where such default may actually have occurred, but where the procedural history raises genuine questions as to the state court's actual reliance on a procedural bar. ... If a state court is slurring its words, our job is not to guess what it might be saying, but rather to demand that it enunciate more clearly. Here, because of numerous factors--the Michigan Supreme Court's reference only to M.C.R. 6.508(D), the absence of a clear and express invocation of a procedural bar, and the plausibility, based on the prior state courts' merits rulings, that the Michigan Supreme Court, too, grounded its decision in a non-procedural reason based on Abela's failure to "establish[ ] entitlement to relief"--we cannot find that M.C.R. 6.503(D)(3), the state procedural rule urged by Respondent, was actually relied on by the Michigan Supreme Court in this case.

*Abela*, 380 F.3d at 923-24; *see also*, *Williams v. Jones*, 231 F. Supp. 2d 586, 597 (E.D. Mich. 2002)

(Lawson, J.).

It is therefore necessary to examine the trial court's Opinion and Order Denying Motion for

Relief from Judgment.  After a brief review of the procedural history, a recitation of Mich. Cr. Rule

6.508(D) and a listing of the issues petitioner presented, the court made the following decision:

> This Court finds that the defendant's arguments are without merit and that he has failed to meet the threshold requirements of MCR 6.508(D).  The issues offered as a basis for this motion have been addressed and decided against the defendant in a prior appeal and the defendant does not contend a retroactive change in the law that has undermined the prior decision.

> For issues not previously raised but could have been raised, a minimum threshold requires that the issue cannot be raised under this rule if the grounds could have been raised in an appeal or other motion unless good cause and actual prejudice is demonstrated. MCR 6.508(D)(3)(a) and (b).  Defendant presents no reason or grounds that would be an exception to the rule.
>
> ***
>
> This Court has reviewed defendant's remaining claims and find them to be without merit and unworthy of any detailed response.  The defendant has failed to show good cause for failure to raise such grounds on appeal and further has failed to show actual prejudice from the alleged irregularities that would support his claim of relief.  The defendant's motion for relief from judgment does not meet the stringent standards of MCR 6.508 and, therefore, is DENIED.

*People v. Lewis,* No. 97-3617 (Wayne County Cir. Ct. March 26, 2003).

The problem with this opinion is that it does not provide any guidance as to which grounds for denial of relief apply to which issues.  It categorizes as one set those issues that were raised in a prior appeal; however none of the issues in the motion for relief from judgment were raised in a prior appeal.  While Issues I through III in the motion could arguably have been raised on direct appeal, the court then reviews the remaining "claims" (emphasis added) and finds "them" to be without merit.  If Issues I-III were all being referenced in the previous paragraph, there would only have been one remaining claim, ineffective assistance of appellate counsel.  It is thus not clear what claims that court is rejecting on the merits.   Likewise, after reviewing the "remaining claims" on the merit, the court also discusses lack of good cause for failure to raise "such grounds" on appeal; however, ineffective assistance of appellate counsel could not have been raised on direct appeal.

The opinion is too confused and confusing to support a conclusion that the state court clearly and expressly rested  its judgment on a state procedural bar. *See e.g. Fama v. Commissioner of Correctional Services,* 235 F.3d 804, 810-11 (2d Cir. 2002) ("when a state court uses language such

20

as '[t]he defendant's remaining contentions are either unpreserved for appellate review or without merit,' ... the state court has not adequately indicated that its judgment rests on a state procedural bar, and its reliance on local law is not clear from the face of the court's opinion." (citations and footnote omitted)); *see also, DeBerry v. Portuondo,* 403 F.3d 57, 65 (2d Cir. 2005). (terse affirmance on basis that "remaining contentions are either unpreserved for appellate review or without merit" followed by citations to state law did not clearly demonstrate reliance on a independent and adequate state procedural bar).

Further, even were the Court to conclude that petitioner's claims III, IV and V are procedurally defaulted, it is still necessary to consider the claims on the merits. Defaulted claims can be reviewed on the merits if the petitioner can show cause for and prejudice attributable to his default in the state courts. *See Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). "[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).

A claim of ineffective assistance of counsel, even a defaulted claim, can serve as cause to excuse procedural default. *See Edwards v. Carpenter*, 529 U.S. 446, 450-451 (2000); *Howard v. Bouchard,* 405 F.3d 459, 478 (6th Cir. 2005). It must generally be presented to the state courts as an independent claim before it may be used to establish cause for procedural default. *Murray v. Carrier*, 477 U.S. at 488-89; *Broom v. Mitchell*, 441 F.3d 392, 401 (6th Cir. 2006).

Petitioner contends here as he did in his motion for relief from judgment that his appellate counsel was ineffective for failing to raise these three claims on direct appeal. If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default.

*See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986). To demonstrate that appellate counsel was ineffective petitioner must show, *inter alia*, that his claims would have succeeded on appeal. *See Smith v. Robbins*, 528 U.S. 259, 285-86 (2000); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996). Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, even if they are defaulted. *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

F.   *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996). *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning."

*Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002). "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694. "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529

23

U.S. at 412).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16. Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue. *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp.2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

Lastly, the reviewing Court presumes the correctness of state court factual determinations. See 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption only with clear and convincing evidence. See *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir.1998).

G.    *Claim I: McKay's Identifications of Petitioner*

    1.    *Background*

Petitioner moved to suppress McKay's in-court and lineup identifications of petitioner as Du-Rod. A Wade hearing was conducted during trial and three witnesses testified: Thomasine Jefferson, the lineup attorney; Investigator Newson, who conducted the lineup; and McKay. Photographs of the lineup were also introduced.

The following was established:   On April 9, 1997, McKay had described Du-Rod to the police as being dark complected, age 19-23, 5'11" tall, and weighing 160-170 pounds. McKay could

24

not describe the hair; his recollection was that Du-Rod was  wearing a skull cap.  The lineup was

held on December 5, 1997.   There were five participants, including petitioner.   Petitioner was the

only one with a clean shaven head.   The other participants had short hair.   Petitioner is dark

complected; the others were described as light, medium (two participants), or very dark complected.

Petitioner weighed 150 pounds; the others 221, 211, 130 and 180 pounds.   Petitioner is 5'9"; the

others 5'8", 5'10", 5'7", and 5'10". Petitioner was thirty years old; the others were 32, 29, 18, 41.

Ms. Thomasine objected to the makeup of the lineup because  petitioner was smaller than most of

the others and because of his shaved head.   According to Ms. Jefferson, petitioner was also better

dressed than the other participants.  In response to her objections Newson tried to find someone else

but failed;  his choices were limited because the lineup was held at police headquarters and not at

the jail.

　　　　According to McKay, he was asked to identify Roderick Lewis; by then the witness had

heard that this was Du-Rod's real name.  He made the identification within a few seconds or minutes

and selected the person he met as Du-Rod.  He claimed his identification was based on the fact that

petitioner's facial features resembled those of a man who used to go to church with McKay and who

was a good friend of the family.  The resemblance was such that when he met Du-Rod he initially

thought it was this other man.

　　　　It was also established through McKay's testimony that he did not know petitioner or Du-

Rod before the day of the shootings, that Du-Rod came out of the projects with Greer and got into

Mckay's car, that they were in the car together for five or six minutes, that petitioner was in the

middle of the back seat and McKay was in the driver's seat, that McKay "tried to look at him a few

times" as he and Bridges conversed with petitioner (12/9/97 Trial Transcript, p. 47), that although

Bridges did most of the talking McKay had reason to observe Du-Rod because half of the money being invested was his, that McKay observed the back of petitioner's shaved head from the rear of the courtroom during part of the preliminary examination, and that he noticed that petitioner was the only participant in the lineup with a shaved head. He denied however that he based his identification on this factor.

The trial court refused to suppress the identifications. It held that the defense had not sustained its burden of showing that the lineup was unduly suggestive and further found that there was an independent basis for the identification, considering the totality of the circumstances, particularly the time McKay spent with petitioner in the car and petitioner's resemblance to McKay's friend. The Michigan Court of Appeals found that the trial court had not clearly erred:

> Defendant first argues that the trial court erred in refusing to suppress the lineup identification of defendant by witness Micah McKay. Specifically, defendant alleges that the disparity in characteristics resulted in a highly suggestive lineup. We disagree. This Court will not reverse the trial court's decision to admit identification evidence unless it is clearly erroneous. Defendant bears the burden of demonstrating that the lineup was impermissibly suggestive when represented by counsel at the lineup. Differences in physical characteristics between the defendant and other members of the lineup goes [sic] to the weight of the identification, not admissibility. In the present case, defendant alleged that the lineup was unfair based on disparity in physical traits and clothing. Defendant has failed to meet his burden of proof, and we cannot conclude that the trial court's decision to admit the evidence was clearly erroneous.

State Appeal, p. 1, 2000 WL 33529630*1 (citations omitted).

2.    *Applicable Law*

In reviewing a due-process claim involving an identification procedure, the Supreme Court has adopted a two-part test: 1.) the defendant must show the identification procedure was impermissibly suggestive; and 2.) if the procedure was suggestive, the court examines the totality

of the circumstances to determine whether the identification was nonetheless reliable. *Manson v. Brathwaite,* 432 U.S. 98, 113-14 (1977); *Neil v. Biggers,* 409 U.S. 188, 198-99 (1972).

An identification procedure is impermissibly suggestive if there is a risk of irreparable mistaken identification. *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967). Unnecessary suggestiveness generally depends "upon whether the witness's attention was directed to a suspect because of police conduct." *Howard v. Bouchard*, 405 F.3d 459, 470 (6th Cir. 2005)(internal quotation omitted).

Even if the identification procedure was suggestive, if an identification is reliable it will nonetheless be admissible. *See Manson v. Braithwaite*, 432 U.S. at 114; *Carter v. Bell*, 218 F.3d 581, 605 (6th Cir.2000). Five factors should be considered in determining reliability: 1.) the witness's opportunity to view the criminal at the time of the crime; 2.) the witness's degree of attention at the time of the crime;  3.) the accuracy of the witness's prior description of the defendant; 4.)  the witness's level of certainty when identifying the suspect at the confrontation; and 5.) the length of time that has elapsed between the time and the confrontation. *Neil v. Biggers,* 409 U.S. at 199-200; *United States v. Gatewood*, 184 F.3d 550, 556 (6th Cir.1999). If the totality of the circumstances indicate that the identification is otherwise reliable, it is for the jury or factfinder to determine the ultimate weight to be given to the identification. See *United States v. Hill*, 967 F.2d 226, 230 (6th Cir.1992).

Although a federal habeas court must afford a presumption of correctness to the state court's factual findings concerning these factors, whether the factors demonstrate reliability in the identification process is a question of law for the federal court to decide. *Thigpen v. Cory*, 804 F.2d 893, 896 (6th Cir.1986); *Robertson v. Abramajtys*, 144 F.Supp.2d 829, 845 (E.D.Mich.2001).

In addition to considering the reliability of the actual identification, courts also look to other

27

evidence to determine whether, if the identification were tainted, permitting the identification was an error of constitutional magnitude because of a very substantial likelihood of irreparable misidentification or whether the error was harmless. See *Robertson v. Abramajtys*, 144 F.Supp.2d at 848; *Sproessig v. Jackson*, 2005 WL 2318987, *4+ (E.D.Mich. Sep 20, 2005) (unpublished).

3.    *Analysis*

The physical characteristics of the participants in the lineup by themselves were not suggestive.  The participants ranged in age, height, weight, and complexion and petitioner, who was neither the smallest nor the darkest, would not have stood out from the others.  While he was the only one with a shaved head, this alone would not be a basis for finding the lineup unduly suggestive because McKay had not described the perpetrator as having this distinctive characteristic. See *Howard v. Bouchard*, 405 F.3d at 470 (lineup was not suggestive even though  defendant was the only suspect with a distinctive high-fade haircut where the witnesses had not previously stated to the police that the assailant had a distinctive haircut)*; United States v. Gibson*, 135 F.3d 257, 260 (2d Cir.1998) (photo array picturing defendant with a goatee was not improperly suggestive where defendant did not establish that the witness earlier told police that the perpetrator wore a goatee). The fact that petitioner was the best dressed is not such a distinctive characteristic as to make him stand out from the others and would hardly point to him as the suspect.

What is suggestive about the lineup and which was not addressed by the Michigan Court of Appeals or the trial court[5] is that the police apparently indicated to McKay that Roderick Lewis was

---

[5]  Although this point was not addressed by the state courts, it is well settled that "[a] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Walker v. Engle*, 703 F.2d 959, 969-970 (6th Cir.1983).

28

in the lineup and that McKay knew from his presence at the preliminary examination that Roderick Lewis had a shaved head. Telling a witness that the accused is in the lineup increases the possibility that the witness will simply pick out the person in the group who looks most like the perpetrator. To avoid this danger, current Justice Department protocols require, among other things, that the police advise a witness before a lineup or showup that the perpetrator is not necessarily included and that it is just as important to rule someone out as to rule them in. U.S. Dept. of Justice, Eyewitness Evidence: A Guide for Law Enforcement (Oct. 1999). However, not all suggestiveness rises to the level of creating irreparable misidentification. *See e.g., Howard v. Bouchard*, 405 F3d at 470 (finding that witness's brief viewing of the accused at two preliminary hearings before the lineup identification "was suggestive, although only minimally so").

Furthermore even if the lineup were unduly suggestive, McKay's identification was sufficiently reliable to satisfy the requirements of due process. While there are factors weighing towards a finding of unreliability: McKay had not met Du-Rod before the day of the shootings and eight months elapsed between the crime and the lineup, *see e.g., Neil v. Biggers,* 409 U.S. at 201 ("a lapse of seven months... would be a seriously negative factor in most cases"), on the other hand, McKay did spend  five or six minutes with Du-Rod in the car during daylight hours*, see e.g.*, *Coleman v. Alabama*, 399 U.S. 1 (1970) (holding admissible an in-court identification by a witness who had a fleeting but 'real good look' at his assailant in the headlights of a passing car),  he was paying attention because his money was at stake, he was struck by the resemblance to his family friend, his perceptions were not distorted by the stress of being the victim of a crime, his description made a few days after the original encounter was within an acceptable range, and he was positive that his identification was correct and was based on the facial features he observed during their drug

negotiations. The finding of reliability is further buttressed by the evidence at trial that Holder, who spent a significant amount of time with his assailants, also identified petitioner as Du-Rod both in court and at a photo showup a few days after the shooting and by the testimony of Officer Quick that he knew from a prior contact that petitioner went by the name Du-Rod. The decision of the state courts that McKay's identifications were admissible was neither contrary to nor an unreasonable application of Supreme Court precedent.

H.      *Claim 11: Loss of Surveillance Video*

        1.      *Background*

        According to a police report prepared by Officer Quick at the hospital, Holder stated that while they were at the shopping center, Du-Rod went into the Rite Aid pharmacy. At the preliminary examination, Holder testified that Du-Rod said he was going to the drugstore and walked in that direction.

        Petitioner moved before trial for preservation of the drugstore's surveillance tape, explaining to the court that Rite-Aid had informed counsel that the tape had been turned over to the police. Counsel incorrectly informed the court that the tape was made at the time of petitioner's arrest. The motion was granted. (6/20/97 Calendar Conference Transcript, pp. 3-4).

        In a motion dated November 20, 1997, the defense moved to dismiss the charges because of suppression of the tape. Defense counsel argued the motion during trial and explained that he had made several attempts to view the tape but had been told that the police had lost it. Counsel argued that the tape was critical because Du-Rod had been described as wearing a distinctive studded jacket; if the tape showed someone who generally fit petitioner's description wearing that jacket but who was not petitioner, this would cast doubt on petitioner's identity as the shooter. The trial court

30

denied the motion, relying on Holder's testimony that he only saw Du-Rod walk towards the drugstore and the fact that the shooting took place at a different location.

As indicated above, Investigator Oliver testified at trial that the tape did show someone with a jacket like that described entering the store but that there was no clear shot of the face and that the tape was of too poor a quality to make an identification.

On direct appeal, as in the current petition, petitioner argued that the loss of the tape resulted in a due process violation and alternatively that defense counsel had been ineffective for failing to request an adverse inference instruction.[6]  The Michigan Court of Appeals rejected these arguments, reasoning as follows:

> There is no denial of due process where the state has failed to preserve evidentiary material which might have been potentially useful unless a criminal defendant can show bad faith on the part of the police.  In the present case, the victim testified that defendant may have entered a pharmacy which was located at a different location other than where the shooting occurred.  Police officers obtained the tape from the pharmacy, but later lost the tape.  Officer Shari Oliver testified that she saw the contents of the tape, which showed a man in a dark jacket entering the pharmacy. However, the tape's quality was insufficient to allow identification. Therefore, the officer could not attest that the man on the tape was defendant. In any event, the tape would only have demonstrated whether defendant actually entered the store. It had no bearing on the victim's identification of defendant as his assailant. Accordingly, the state's failure to preserve the evidence, in the absence of bad faith, was not a denial of defendant's due process rights, and there was no need for an adverse inference instruction.

State Appeal, p.2, 2000 WL 33529630*1 (citations omitted).

    2.    *Applicable Law*

_____

[6]  Petitioner also argued that the trial court had an obligation to *sua sponte* give such an instruction but he has not pursued that argument in his petition.  Errors in jury instructions in a state criminal trial generally are not reviewable in habeas corpus proceedings unless they deprived the defendant of a fundamentally fair trial and due process of law. *See Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  In order to show a violation of the *Brady* rule, the petitioner has the burden of establishing three components: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice  must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). *See also, Carter v. Bell*, 218 F.3d 581, 601 (6th Cir.2000).  Prejudice is established by showing that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).  On habeas review, a  reasonable probability of a different result is shown when the government's evidentiary suppression undermines confidence in the outcome of the trial.  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

Failure of a state to preserve evidence that is only potentially useful or "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant," does not violate the Due Process Clause  "unless a criminal defendant can show bad faith on the part of the police...." *Arizona v. Youngblood*, 488 U.S. 51, 57, 58 (1988).  Bad faith is shown by  a "a calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland* and its progeny." *California v. Trombetta,* 467 U.S. 479, 488 (1984).  "The presence or absence of bad faith ... turn[s] on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 57. When the government is negligent or even grossly negligent in failing to preserve potentially

32

exculpatory evidence, bad faith is not established. *Monzo v. Edwards*, 281 F.3d 568, 580 (6th Cir.2002); *United States v. Wright*, 260 F.3d 568, 571 (6th Cir.2001); *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir.1996).

To establish a violation of the right to effective assistance of counsel, petitioner must satisfy two components. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington,* 466 U.S. 668, 687 (1984). To demonstrate that counsel's performance was deficient, petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. To demonstrate prejudice, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id*. Both the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact entitled to de novo review. *Combs v. Coyle*, 205 F.3d 269, 278 (6th Cir.2000).

    3.    *Analysis*

Petitioner has not met his burden of showing a Brady violation because he has not shown that the tape was exculpatory. Investigator Oliver testified that the detail was insufficient to identify the person in the jacket. Aside from the separation in time and place from the shootings, even if it could have been determined that the person on the tape was someone other than petitioner, there would

33

still have been a question as to whether this was the actual jacket worn by Du-Rod or if in fact that was simply someone else wearing a similar jacket.

Petitioner's claim also fails under *Youngblood*.  Even assuming that the tape could have been potentially useful, petitioner has not made out a case that the police acted in bad faith.  Having found the tape inadequate as a tool for identifying the perpetrators, it cannot be said that they acted with knowledge of its excupatory value or that they had any motive to circumvent *Brady*.

Petitioner likewise fails in his claim that counsel was ineffective for not requesting that the jury be instructed that  it could infer that the evidence would have been favorable to the defense. In Michigan, a defendant is entitled to an adverse inference instruction upon a showing of bad faith. *People v. Davis*, 199 Mich.App 502, 514-515, 503 N.W.2d 457 (1993).  Because petitioner failed to established that the police acted in bad faith in losing the tapes he was not entitled to such an instruction.  A defense counsel does not render ineffective assistance by failing to take an action that would be futile. *See People v. Snider*, 239 Mich.App 393, 425, 608 N.W.2d 502 (2000); *People v. Torres*, 222 Mich.App 411, 425, 564 N.W.2d 149 (1997).  Nor does petitioner meet the prejudice prong of *Strickland*: in light of the two positive identifications and the testimony of Officer Quick, there is not a reasonable probability that an adverse inference instruction would have resulted in an acquittal.

I.     *Claim III: The Judge's Comments to the Deadlocked Jury*

     1.     *Background*

On December 10, 1997, the jury deliberated from 2:00 p.m. until around 3:00 p.m. when they were excused for the day.  The jurors resumed deliberations the following day, December 11, 1997, at 9:07 a.m..  At around 12:10 p.m. the jury sent a note to the judge stating, "We have a hung jury."

Sometime after that, the jurors sent a second note, requesting a transcript of Holder's testimony.

Holder's testimony was played back to the jury starting at 2:48 p.m. Immediately after, the judge

addressed the jury as follows:

> THE COURT: The jury had sent a note out earlier asking, the note said, asked for transcript. We don't have a transcript of the proceedings, Members of the Jury, no written transcript is available so we had the testimony played back for you.
>
> Also, there was a note before that point that I think, the time was approximately 12:10, 12:11, or thereabouts saying, "We have a hung jury."
>
> I am not going to declare a hung jury in this case specifically since you did ask for other testimony after that. But I do want to respond to that by way of some further instructions, comments on that.
>
> First of all, my recollection here in terms of the actual time to the point that you sent the note would have been approximately, counting yesterday, the fact that we left a little earlier, from the time you were released and then your lunch, approximately maybe one o'clock. Then this morning if you did start at about nine, and the note came at about twelve, about three hours of deliberation on this case.
>
> I'm sure you can appreciate and understand the time and effort that it takes to get a case ready for trial, the trial of the case, and that both sides would like a fair resolution of the case; and for you to dedicate yourself to doing that. I think that four or five hours may not be indicative of that effort. At least I think that more time should be spent with it.
>
> Additionally, keep in mind that when you -- you use the whole standards of law that I told you about, of the instructions that I have given you. Apply the facts as you find them to the law that I have given you.
>
> I also caution this. Just from my experience in talking to jurors after cases have been disposed of I am often somewhat appalled at how often jurors get off on ancillary, unimportant issues that are not centered on looking at the evidence and the elements, other things that may be diversions, or kind of play detective, or those kind of things. Just don't do that if there is a tendency to do that. Again, follow the instructions as I have given them to you. Apply the law, proof beyond a reasonable doubt and so forth.
>
> Now, you have returned saying that you believe you are unable to reach a verdict. I want to ask you to return to the jury room and resume your deliberation process, in the hope that after further discussion you will be able to reach a verdict. Please keep in mind the following. You've heard these basically yesterday.
>
> A verdict in a criminal case must be unanimous.
>
> In order to return a verdict it is necessary that each of you agree upon that verdict.
>
> In the jury room you will discuss the case among yourselves, but ultimately each of you will have to make up your own mind. Any verdict much [sic] represent the individual considered judgment of each juror.
>
> It is your duty to consult with your fellow jurors, and to deliberate with a

view to reaching an agreement if you can do so without violating your own judgment.

Before deciding the case give impartial consideration to the views of your fellow jurors. This means that you should give respectful consideration to one another's views. Talk over differences of opinion in a spirit of fairness and frankness.

It is natural that differences of opinion will arise. When they do each of you should not only express your opinions, but also the facts and reasons upon which you base that opinion. By reasoning the matter out it is often possible for all of the jurors to agree.

In the course of your deliberations do not hesitate to re-examine your own views and change your opinions if you are convinced that you are wrong. However, none of you should surrender your honest conviction as to the weight and effect of the evidence, lack of evidence solely because of the opinion of your fellow jurors for the mere purpose of returning a verdict.

Also, remember that I did record the instructions that I gave to you yesterday. Again, I advise you to follow all of the instructions. If you think you need to hear those again let me know.

Again, we're going to be on the same schedule today and if necessary tomorrow, in case you're wondering if that would change in any kind of way.

So, I'm going to send you back now to the jury room. (Jury excused at 3:45 p.m.)

(12/11/97 Trial Transcript, pp. 47-52).

In response to the judge's inquiry, both attorneys affirmatively stated on the record that they had no objection. The jury was excused for the day at around 4:15 p.m. Deliberations resumed the next morning, December 12, 1997, and the verdict was taken at 2:09 p.m..

Petitioner contends that the trial court's delay in responding to the jurors' first note and the comment that it was "not going to declare a hung jury in this case" made it appear to the jury that the court would not permit a hung jury under any circumstances and that the instructions which followed this comment were thereby rendered meaningless. Petitioner further contends that the comments about the time and effort put into the case and about how the judge was personally "appalled" by some juries' focus on non-essentials were coercive. This claim was first raised in the motion for relief from judgment.

2.    *Applicable Law*

36

Jury deliberations are a critical stage of a criminal trial. *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946).   When a jury is deadlocked, a trial court may give a supplemental charge urging the jury to continue its deliberations in order to arrive at a verdict. See *Allen v. United States*, 164 U.S. 492 (1896).   A proper Allen charge urges the jury  to continue to discuss the evidence and to listen "to each other's arguments," but also emphasizes that "the verdict must be the verdict of each individual juror, and not the mere acquiescence in the conclusion of his fellows."  *Id*. at 501.   It is  improper to instruct the jury that it is required to agree, *Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam) (finding judge's statement to jury, "You have got to reach a decision in this case," coercive); to single out the minority in urging further consideration of the case, *Williams v. Parke,* 741 F.2d 847, 850 (6th Cir.1984); to tell the jury that they are the only ones who can decide the case, *Jones v. Norvell*, 472 F.2d 1185, 1185 (6th Cir.1973); to inquire as to the numerical split, *id.;* or to indicate that a hung jury is unacceptable by emphasizing extraneous factors such as the harried judge's trial schedule, *United States v. Scott*, 547 F.2d 334, 337 (6th Cir.1977) (instruction held invalid on direct review).

A single improper comment in an otherwise correct Allen charge does not make out a constitutional violation.  The question is whether the Allen charge was coercive considering the totality of circumstances. *Williams*, 741 F2d at 750-752 (although the judge elicited the numerical split, told the jurors this case "must be decided," and failed to expressly remind them of their right to disagree, under the totality of the circumstances the instruction was not so coercive as to deprive petitioner of his constitutional rights); *Miller-Bey v. Stine*, 159 F.Supp.2d 657,666-67(E.D.Mich.2001)(although the judge did remind the jurors that the case should  be decided at some time and that there was no reason to believe that there would be a better jury or more or clearer

evidence in the future, this language was not so coercive as to rise to the level of a constitutional violation in light of the remainder of the instruction).

Further, an Allen charge must be reviewed " 'in its context and under all the circumstances.'" *Lowenfield v. Phelps*, 484 U.S. 231, 237 (1988) (quoting *Jenkins* at 446).[7] "[T]he due process inquiry associated with an Allen charge focuses on the circumstances that triggered the charge, as well as the language of the charge itself."*Henderson v. Collins*, 262 F.3d 615, 619 (6th Cir. 2001).

To warrant habeas relief a jury instruction must not merely be erroneous but also taken as a whole so infirm that it rendered the entire trial fundamentally unfair. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Henderson v. Kibbe,* 431 U.S. 145, 154 (1977). If an instruction is ambiguous and not necessarily erroneous, it violates the Constitution only if there is a reasonable likelihood that the jury has applied the instruction improperly. *Estelle*, 502 U.S. at 72, 73 n. 4.

3.    *Analysis*

In the present case, there is no reasoned state court opinion denying this claim. Where a claim is fairly presented in state court but the state court, although denying the claim, fails to address it, a federal court on habeas review must conduct an independent review of the state court's decision. *Harris v. Stovall*, 212 F.3d 940 (6th Cir.2000). This independent review requires the federal court to "review the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented." *Id*. at 943. However the independent review "is not a full, de novo review of the claims, but remains deferential because the

---

[7] In *Lowenfield* the Supreme Court's considerations included the contents of the note from the jury, the manner in which the trial judge polled its members and the length of deliberations that followed the Allen charge.

court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA." *Id.*

On this record, it cannot be said that the state court's rejection of this issue was contrary to or an unreasonable application of Supreme Court precedent. The trial courts's instructions were improper in some respects but, considering the totality of the circumstances, they were not so coercive as to violate petitioner's due process rights to an impartial jury and a fundamentally fair trial.

Certainly it was appropriate for the judge to not declare a hung jury at that point and to give an Allen charge, considering that the jury had not deliberated very long and, as evidenced by the second note, the jury recognized that further deliberation was in order and could be productive.

While the judge's statement about not declaring a hung jury "in this case" could in isolation be equated with telling the jury that it had to reach a verdict, in the context of the remainder of the instructions it would not have had this effect.  For instance,  the judge indicated that the parties "would like a fair resolution," not that they had to have one. Likewise, he told the jurors that he was asking them to resume deliberations "in the hope" that they would be able to reach a verdict, not because they were required to.  While the judge's comments about the time and effort put into the case and the expectations of the parties suggested that a hung jury was not appropriate, the instructions also made it clear to the jurors that each juror had to make up his own mind and that none should surrender their honest convictions for the sake of reaching a verdict.   The judge's admonishment to remain focused on the evidence and the elements, while a deviation from a standard Allen charge, would not create a danger that some of the jurors would surrender their own views and be coerced into a verdict.   "The propriety of an Allen-type charge depends on whether

it tends to coerce undecided jurors into reaching a verdict by abandoning without reason conscientiously held doubts." *United States v. Robinson,* 560 F.2d 507, 517 (2d Cir.1977) (en banc).

Other factors as well support that conclusion that the instructions were not unconstitutionally coercive. It is significant that the jury deliberated for a substantial amount of time after the charge. *See e.g., United States v. Sawyers,* 902 F.2d 1217, 1221 (6th Cir.1990) ("[T]he fact that the jury deliberated an additional two hours after the Allen charge also supports the conclusion that they did not feel they had been ordered to return a verdict.") It is also relevant that defense counsel did not object to the instructions because this "indicates that the potential for coercion ... was not apparent to one on the spot." *Lowenfield v. Phelps*, 484 U.S. at 240 (footnote omitted).

J.      *Claim IV: Failure to Correct Perjured Testimony*

   1.    *Background*

At the preliminary examination, Holder made no mention of Shawn Hall's person or presence and denied that he saw anyone else in the area at the time of the shootings.[8] At trial, Holder testified that he called Hall for protection, that Hall met him at the shopping center, that he sat in Hall's car while petitioner went towards the drugstore and returned with the second perpetrator, that Hall followed them to Fleming Street, and that Hall was also fired upon by the assailants. The jury was not made aware of Holder's prior inconsistent testimony and petitioner argues that the prosecutor failed to correct obviously perjured testimony. This issue was first raised in the motion for relief from judgment.

---

   [8] While petitioner's quotations from the preliminary examination transcript are not entirely accurate, this much is supported by the record.

2.      *Applicable Law*

The knowing use of perjured testimony, including the failure to correct false testimony, constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. *Napue v. Illinois,* 360 U.S. 264, 265-72 (1959); *Giglio v. United States*, 405 U.S. 150 (1972).   In order to prove this claim, the burden is on petitioner to show that 1.) the evidence the prosecution presented was false, 2.) the prosecution knew it was false and 3.) the false evidence was material. *Coe v. Bell,* 161 F.3d 320, 343 (6th Cir. 1999); *United States v. Hawkins*, 969 F.2d 169, 175 (6th Cir.1992).   "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. at 682.

To establish a claim of prosecutorial misconduct or a denial of due process based on the knowing use of false or perjured testimony, a habeas petitioner must show that a witness's statement was "indisputably false."   *Byrd v. Collins*, 209 F.3d 486, 517-18 (6th Cir.2000).   "Contradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecution knowingly presented perjured testimony." *Tapia v. Tansy*, 926 F.2d 1554, 1563 (10th Cir.1991); *see also, United States v. Holladay*, 566 F.2d 1018, 1019 (5th Cir.1978) ("Presentation of a witness who recants or contradicts his prior testimony is not to be confused with eliciting perjury.").

3.      *Analysis*

Applying the independent yet deferential review described in *Harris,* the state court's rejection of this issue was not unreasonable or contrary to federal law. Petitioner has failed to meet

41

the requisite burden. He has not shown that the trial testimony was the false version, only that it was different from the version presented at the preliminary examination. For this same reason he has not shown that the prosecutor knew it was false. Nor has he shown that the evidence concerning Shawn Hall was material. Petitioner was not charged with shooting Hall and Hall did not appear at trial. The major issue at trial was whether petitioner was correctly identified as one of the perpetrators; whether or not Holder was lying or telling the truth about Hall's presence had no bearing on this issue. In terms of Holder's general credibility, the jury was informed that he was a drug dealer, that he lied to the police about the circumstances of the shootings and that he misrepresented the facts to the police when he eliminated all mention of McKay. It is inconceivable that the revelation of yet one more lie would have affected the outcome of the case, particularly since Holder's identification was corroborated by that of McKay and by Officer Quick's testimony that petitioner was known as Du-Rod.

K.      *Claim V: Ineffective Assistance of Trial Counsel*

1.      *Background*

Petitioner claims that his trial counsel was ineffective in two instances: 1.) he failed to object to the trial court's *Allen* charge and 2.) he failed to impeach Holder with the inconsistent version of events given at the preliminary examination.   He presented this claim initially in his motion for relief from judgment.

2.      *Applicable Law*

As previously stated, to establish a violation of the right to effective assistance of counsel, petitioner must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. *Strickland v. Washington, supra.*  A petitioner's challenge to

42

tactical decisions must overcome a presumption that the challenged action might be considered sound trial strategy. *Darden v. Wainwright*, 477 U.S. 168, 185-87 (1986). "[C]ourts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *Dell v. Straub*, 194 F.Supp.2d 629, 651 (E.D. Mich. 2002). "Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available." *Id.*

3.     *Analysis*

Petitioner has not established that he was prejudiced by defense counsel's failure to object to the Allen charge.  As discussed above, the Allen charge viewed in its totality would not have coerced a juror  into abandoning his convictions and returning a guilty verdict.  Therefore there is not a reasonable probability an objection would have affected the outcome.  Having failed to sustain his burden under the prejudice prong of *Strickland*, no further inquiry is needed.  *Strickland*, 466 U.S. at 694 (directing that courts need not address both components of the inquiry "if the defendant makes an insufficient showing on one." )  *See also, Howard v. Bouchard*, 405 F.3d 459, 485 (6th Cir. 2005).

As far as counsel's failure to impeach Holder with his preliminary examination testimony, respondent argues that trial counsel made a tactical decision to leave Hall's presence at the scene unquestioned.  Respondent correctly points out that in closing argument defense counsel suggested that since Hall was called in for protection,  he must have been armed and he could have fired the first shot, thus calling into doubt the prosecution's theory as to how the shootings actually took place.    Counsel's argument could in fact explain why the jury acquitted petitioner of the premeditated murder charge.  Considering this, petitioner cannot overcome the  presumption that

43

counsel made a competent strategic decision.

Further, even if petitioner is correct that counsel should have impeached Holder with his prior inconsistent version of events, he has not met his burden of showing a reasonable probability that such impeachment would have led to a different result. As previously discussed, the jury was aware both that there were significant reasons to carefully scrutinize Holder's credibility and that his identification testimony was well corroborated. Had he been questioned about his preliminary examination testimony, Holder could have easily explained that he had been attempting to protect Hall, as he apparently had attempted to protect McKay. Furthermore there was no evidence that Holder, whatever his general credibility might be, had a motive to falsely identify petitioner.

L.    *Claim VI: Ineffective Assistance of Appellate Counsel*

1.    *Background*

Petitioner asserts, as he did in his motion for relief from judgment, that his appellate attorney was ineffective for not raising the above Claims III, IV, and V on direct appeal. As to Claim III, he further asserts that he requested appellate counsel to raise the issue but that counsel responded that he would not because trial counsel had not preserved the issue. Appellate counsel did describe the court's comments in the Brief on Appeal, p. 13, but noted that there had been no objection and the issue was therefore not preserved.

2.    *Applicable Law*

A criminal appellant is constitutionally entitled to the effective assistance of counsel in his direct appeal. *Evitts v. Lucey*, 469 U.S. 387, 396 (1985); *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir.2003). Under *Strickland,* petitioner must show  that appellate counsel's performance was deficient and that he suffered prejudice as a result. The professional judgment of appellate counsel

44

includes the determination of which colorable claims to raise on appeal and counsel is not ineffective for failing to raise every colorable claim. *Jones v. Barnes*, 463 U.S. 745, 753-54 (1983).   A defendant  does not have a constitutional right to have his counsel press nonfrivolous points if counsel decides as a matter of professional judgment not to press those points.  *Id.* at 750-51 (1983). "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." To show  prejudice in the context of ineffective assistance of appellate counsel, a defendant must show a reasonable probability that, but for his counsel's defective performance, he would have prevailed on appeal. *Smith v. Robbins,* 528 U.S. 259, 285 (2000).

      3.    *Analysis*

      Petitioner has failed to establish ineffective assistance under *Strickland.*   In terms of performance, appellate counsel raised four issues on direct appeal, three of which petitioner has included in his petition.   Counsel raised those issues that were preserved and which would be reviewed under a more favorable standard than those which were not, *see People v. Carines,* 460 Mich. 750, 774, 597 N.W.2d 130 (1999), he was not obliged to raise every colorable claim, the issues he did not raise were not stronger than those he did, and there is no other apparent circumstance which would overcome the presumption of effectiveness. Appellate counsel's decision not  to challenge the trial court's comments and instructions to the deliberating jury is particularly unassailable.  Because trial counsel stated on the record that there was no objection to the court's Allen charge, not only was the issue unpreserved under Michigan law, it was also waived and appellate review even for plain error was therefore unavailable. *People v. Carter*, 462 Mich. 206, 215, 612 N.W.2d 144 (2000); *People v. Lueth*, 253 Mich.App 670, 688, 660 N.W.2d 322 (2002).

Petitioner has also failed to show the requisite prejudice.  In light of the above analyses of the merits of Claims III, IV and V,  petitioner has not shown he would have prevailed if the issues had been raised on direct appeal.

M. *Claim VII: Trial Court's Refusal to Exclude McKay's Testimony*

1.      *Background*

At the preliminary examination, McKay entered the courtroom while Holder was testifying and remained there despite the district judge's sequestration order.  McKay also observed the back of petitioner's head during that time.  McKay testified that he was unaware of the sequestration order and the record shows that the order was announced before Holder began testifying.   At trial, the defense moved to exclude McKay's testimony because of the violation and the trial court denied the motion.  On direct appeal, Petitioner argued that the trial court had abused his discretion as a matter of Michigan law. The Michigan Court of Appeals held that under Michigan law petitioner was required to show prejudice and had failed to do so in light of McKay's testimony that his identification was premised on petitioner's resemblance to a family friend and not on his observation of the back of petitioner's head.  State Appeal, p.2, 2000 WL 33529630*2.  Petitioner now argues that the trial court's decision denied him his constitutional right to fundamental fairness.

2.      *Applicable Law*

Generally a claim that a state trial court violated state law is not cognizable in federal habeas corpus. *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir.1983).   Only errors of state law that result in a denial of fundamental fairness are cognizable in federal habeas corpus proceedings. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

While sequestration of witnesses is a time-honored practice designed to increase the

likelihood that testimony will be candid, it is not required by the due process clause. *See Bell v. Duckworth*, 861 F.2d 169, 170 (6th Cir. 1988); *see also, Mathis v. Wainwright*, 351 F.2d 489, 489 (5th Cir.1965) (noting that the failure to sequester witnesses does not amount to a deprivation of constitutional rights); *King v. Elo,* 2000 WL 791721, at *10 (E.D.Mich. May 25, 2000) (same). Petitioner is not entitled to habeas relief unless violation of the order was "so prejudicial as to call into question the fundamental fairness of [the] state trial." *Ashker v. Class*, 152 F.3d 863, 872-73 (8th Cir.1998).

       3.    *Analysis*

     Petitioner has not shown that the refusal to sequester McKay was fundamentally unfair.  The state court credited McKay's assertions that his violation of the order was inadvertent and that his identification was unaffected by it.  In the absence of clear and convincing evidence to the contrary this determination is considered correct.  While petitioner also argues that it was unfair to allow the prosecution to present McKay at trial to corroborate Holder's testimony after having previously heard it,  he was cross-examined about the violation and its effects and McKay testified that his trial testimony was unaffected by what he heard  at the preliminary examination.  This was adequate to protect petitioner's due process rights.  *See e.g., United States v. Jiminez*, 780 F.2d 975, 981 (11th Cir.1986) (where the violation of the sequestration order was inadvertent  cross-examination was an   adequate remedy: " Striking testimony is 'a serious sanction,' appropriate only where 'the defendants have suffered actual prejudice, and there has been connivance by the witness or counsel to violate the rule.'"(quoting on *United States v. Blasco*, 702 F.2d 1315, 1327 (11th Cir.1983)).  The jury in petitioner's case was  also informed that McKay and Holder had discussed the version of events that they would present to the authorities in the hospital before the preliminary examination

47

and were thus even more aware that McKay's testimony could have been tailored to fit Holder's.

N.     *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law.  Accordingly, the Court should deny petitioner's application for the writ of habeas corpus.

III.     NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  See *Willis v. Sullivan,* 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Paul J. Komives
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: August 31, 2006

The undersigned certifies that a copy of the foregoing
order was served on the attorneys of record by electronic
means or U.S. Mail on August 31, 2006.

s/Eddrey Butts
Case Manager

49